900 F.2d 255
Unpublished Disposition
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
SHELL ISLAND INVESTMENT; South Shell Venture; First
Washington Corporation; North Shell Island
Development Corporation, Plaintiffs-Appellants,
v.
TOWN OF WRIGHTSVILLE BEACH, NORTH CAROLINA, Defendant-Appellee.
 No. 89-2018.
 United States Court of Appeals, Fourth Circuit.
 Argued: Oct. 4, 1989.
Decided: April 2, 1990.
 
 Appeal from the United States District Court for the Eastern District of North Carolina, at Wilmington. James C. Fox, District Judge. (CA-87-77-7-CIV)
 Roy C. Bain, Burney, Burney, Barefoot & Bain, Wilmington, N.C., for appellants.
 William Alfred Blancato, Hendrick, Zotian, Cocklereece & Robinson, Winston-Salem, N.C., for appellee.
 Burney, Burney, Barefoot & Bain, Wilmington, N.C., for appellants.
 Hendrick, Zotian, Cocklereece & Robinson, Winston-Salem, N.C.; Kenneth A. Shanklin, Wilmington, N.C., for appellee.
 E.D.N.C., 703 F.Supp. 1192.
 AFFIRMED.
 Before PHILLIPS, Circuit Judge, HAYNSWORTH,[1] Senior Circuit Judge, and WILLIAMS, United States District Judge for the Eastern District of Virginia, sitting by designation.
 PHILLIPS, Circuit Judge:
 
 
 1
 Claiming that the imposition of utility system impact and tap fees by the Town of Wrightsville Beach, North Carolina, violated their rights under the equal protection clause and state law, developers of property in the Shell Island area sought a declaration of rights, injunctive and monetary relief, costs and attorney fees in an action brought under 42 U.S.C. Sec. 1983 and state statutes. The district court sitting without a jury denied all relief and the developers have appealed. We affirm.
 
 
 2
 * Shell Island Investment Company, et al (collectively Shell Island Developers), are the developers of an area known as Shell Island, at Wrightsville Beach, North Carolina. The Town of Wrightsville Beach (Wrightsville Beach or Town) is a municipal corporation located in New Hanover County and organized under the laws of North Carolina. Shell Island constitutes approximately one third of Wrightsville Beach's total land area. Until Shell Island Developers became owners, Shell Island was largely undeveloped.
 
 
 3
 On August 24, 1972, Wrightsville Beach passed an ordinance establishing a "Water and Sewer Acreage and Unit Usage Fee." In 1983, the residential unit fee was $500 per unit. Additionally, residents were required to pay a water tap and a sewer tap fee. These fees were in force until 1984. Between November 29, 1984, and December 12, 1984, the various Shell Island plaintiffs petitioned for annexation into Wrightsville Beach, and between January 25, 1985, and March 27, 1985, the area in issue was annexed. Between petition and annexation, the Town increased the residential impact fee from $500 to $1500 per residential unit pursuant to Sec. 20-17 of the Code of Ordinances of the Town of Wrightsville Beach. Wrightsville Beach also increased the water and sewer tap fees. These rate and fee changes were, with exceptions, across the board and not limited to Shell Island's developments. The increased fees (hereinafter colle tively referred to as impact fees) were purportedly imposed to offset both past and future anticipated costs of improvements to Wrightsville Beach's sewer and water infrastracture caused, in large part, by anticipated development on Shell Island.
 
 
 4
 Shell Island Developers paid the impact fees under protest in order to obtain necessary development permits. In addition to the impact fees, Wrightsville Beach required Shell Island Developers to provide roads, lift stations, and pump stations. Finally, Shell Island Developers were required, at their expense, to install water and sewer lines and connect these lines to extant lines. Wrightsville Beach placed the proceeds of the impact fees in the Town's Capital Reserve Account and commingled them with funds collected from other sources. Shell Island Developers allege that these funds were improperly used to fund projects other than sewer and water services. In 1986, pursuant to Sec. 20-17 of the Town Ordinance, Wrightsville Beach again increased the impact fees from $1500 to $3000.
 
 
 5
 The 1984 and 1986 impact and tap fee increases must be viewed in historical perspective. Shell Island's development was anticipated to increase the Town's 1984 population by over 20% and to account for 75% of all new growth. See generally J.A. 246. The development would impact both sewer and water system capacities. Before 1983, Wrightsville Beach's sewer capacity was 870,000 gallons per day. In response to anticipated growth, Wrightsville Beach connected onto the Wilmington-New Hanover Sewer Interceptor which increased Wrightsville Beach's sewer capacity to 1.5 million gallons per day. By 1985, after Shell Island developments were annexed, the average daily demand far exceeded the erstwhile 870,000 gallon per day capacity.
 
 
 6
 Wrightsville Beach's water capacity was similarly stressed. In 1980, the level of salt chloride intrusion into Wrightsville Beach's water supply, caused by overpumping of Wrightsville Beach wells, exceeded EPA recommendations. See J.A. at 231 (district court's finding of fact). In 1984, the peak day demand for water in the summer was 1,246,700 gallons and the daily average demand was 994,366 gallons. The average daily capacity was 1,111,680 gallons with a storage capacity of approximately 500,000 gallons. Anticipated growth from Shell Island alone would exceed Wrightsville Beach's water capacity by increasing demand on the Wrightsville Beach water supply by 220,000 gallons per day.
 
 
 7
 As indicated, the district court found no violation of either federal constitutional nor state statutory rights and this appeal followed.
 
 II
 
 8
 Shell Island, relying primarily on Railroad Commission v. Pullman Co., 312 U.S. 496 (1941), first argues that the district court should have abstained from hearing its claims in order to allow the North Carolina courts to determine whether North Carolina law would authorize the disputed impact fees under any circumstances.[2] Although until this appeal Shell Island had opposed abstention, its original opposition results in neither estoppel nor waiver, see Grimes v. Crown Life Ins. Co., 857 F.2d 699, 707 (10th Cir.1988), nor does it prevent this court's consideration of abstention as the proper course at this point. See Caleb Stowe Assn. v. County of Albermarle, 724 F.2d 1079, 1080 (4th Cir.1984).
 
 
 9
 Pullman abstention is appropriate where there is "(1) an unclear issue of state law presented for decision (2) the resolution of which may moot or present in a different posture the federal constitutional issue such that the state law issue is 'potentially dispositive.' " Educational Serv., Inc. v. Maryland State Bd. for Higher Educ., 710 F.2d 170, 174 (4th Cir.1983) (quoting Donohoe Constr. Co. v. Montgomery County Council, 567 F.2d 603, 607 (4th Cir.1977)). Shell Island now contends that the issue whether the North Carolina Public Enterprise Statute, N.C.Gen.Stat. Secs. 160A-311 et seq., authorizes under any circumstances impact fees for the purposes here in issue is sufficiently unclear that the requirement that this court resolve Shell Island Developers' federal constitutional claims would be obviated by a North Carolina court's likely finding that the imposition of the impact fees here challenged was per se unauthorized under state law.
 
 
 10
 In determining whether an issue of state law is sufficiently unsettled to warrant Pullman abstention,
 
 
 11
 the relevant inquiry is not whether there is a bare, though unlikely possibility that state courts might render adjudication of the federal question unnecessary. Rather, ... "abstention is not to be ordered unless the statute is of an uncertain nature, and is obviously susceptible of a limiting construction."
 
 
 12
 Hawaii Hous. Auth. v. Midkiff, 467 U.S. 229, 237 (1984) (quoting Zwickler v. Koota, 389 U.S. 241, 251 & n. 14 (1967)). "The abstention doctrine is not an automatic rule applied whenever a federal court is faced with a doubtful issue of state law; it rather involves a discretionary exercise of a court's equity powers." Baggett v. Bullott, 377 U.S. 360, 375 (1964). Indeed, only when the state law is "far from clear" is abstention the appropriate option. Pullman, 312 U.S. at 499. The newness of the state statute and the absence of judicial precedent are significant considerations. See, e.g., Pullman, 312 U.S. 496; Lake Carriers Ass'n v. MacMullen, 406 U.S. 498 (1972); A.F.A. Distrib. Co. v. Pearl Brewing Co., 470 F.2d 1210 (4th Cir.1973).
 
 
 13
 Shell Island's basic contention about the "unsettled state" of North Carolina law on the matter at issue is that, because North Carolina municipalities are creatures of strictly enumerated powers, see Upchurch v. Hudson Funeral Home, 140 S.E.2d 17, 19 (N.C.1965), and because imposition of impact fees to be placed in a fund for future capital construction is nowhere expressly authorized in the North Carolina Public Enterprise Statute, wherein general authorization must be found, it is at least arguable that Wrightsville Beach's imposition was ultra vires of North Carolina law. This, argues Shell Island Developers, counsels abstention by this court until the issue has been addressed specifically by the North Carolina courts. We disagree.
 
 
 14
 North Carolina's Public Enterprise Statute, N.C.Gen.Stat. Secs. 160A-311 et seq., authorizes municipalities to establish, operate and finance public enterprises which include, inter alia, "water supply and distribution systems," and "sewage collection and disposal systems of all types." See N.C.Gen.Stat. Sec. 160A-311. "A city may establish and revise from time to time schedules of rents, rates, fees, charges, and penalties for the use of or the services furnished by any public enterprise." N.C.Gen.Stat. Sec. 160A-314. There is no dearth of authority, in state decisions going back at least as far as 1949, interpreting the relevant statute on the matter at issue; and it all runs against Shell Island's contention.
 
 
 15
 Most critically, North Carolina's highest court has held directly that in setting "rates and charges" under the statute's authorization, "a municipal body may include not only operating expenses and depreciation, but also capital costs associated with actual or anticipated growth...." Town of Spring Hope v. Bissette, 280 S.E.2d 490, 493 (N.C.App.1981) (upholding municipality's authority to increase water and sewer charges to pay for a new waste treatment facility), aff'd, Town of Spring Hope v. Bissette, 287 S.E.2d 851, 853 (N.C.1982).
 
 
 16
 Moreover, the North Carolina courts have held that a municipality has the right to discriminate in the imposition of such costs by "classify[ing] consumers under reasonable classifications based upon such factors as the costs of service ... or any other matter which presents a substantial ground of distinction." Town of Taylorsville v. Modern Cleaners, 237 S.E.2d 484, 486 (N.C.App.1977) (construing the Public Enterprise statute) (citation omitted). See also Utilities Comm'n v. Mead Corp., 78 S.E.2d 290, 300 (N.C.1953) ("Rates may be fixed in view of dissimilarities in conditions of service, but there must be some reasonable proportion between the variances in the conditions and the variance in the charges. Classification must be based on substantial difference."). Absent any statutory or constitutional restrictions, "the rates and fees that may be charged to ... residents in connection with the use of its public utilities, are matters that may be determined by its governing body in its sound discretion." Atlantic Constr. Co. v. City of Raleigh, 53 S.E.2d 165, 169 (N.C.1949). This general authority is, however, limited by the requirement that any such charges must not be imposed arbitrarily, a matter to be proven by any person challenging a particular imposition for arbitrariness. Bissette, 287 S.E.2d at 854.
 
 
 17
 We conclude that it is well settled by authoritative state court decisions that despite the absence of any express authorization in the Public Enterprise Statute for municipalities to establish or increase utility fees in order to offset future capital improvements to their sewer and water infrastructures, general authority to do so is implicit in relevant state law, limited only by the requirement that any discrimination among users be not based on arbitrary or unreasonable classifications. That being so, there is no justification for abstaining to permit state adjudication of the matter, see Harris County Commissioners v. Moore, 420 U.S. 77, 83 (1975), and we may turn to the contention that even if generally authorized, the imposition here was invalid for arbitrariness under state law.
 
 III
 
 18
 We conclude, with the district court, that the appellants have not shown the impact fees here to have been imposed arbitrarily or unreasonably.
 
 
 19
 Shell Island's development was expected to increase the town's population by twenty percent and account for 75% of all new growth. The district court's undisputed findings reflected that in 1984 a reasonable estimate of the cost of various improvements to the water and sewer infrastructure required to handle anticipated growth was from $1.5 to 2 million dollars. See J.A. at 260. These improvements included, among other things, the addition of a well, a water treatment facility, an elevated tank, a subaqueous crossing, and the repair and replacement of sewer lines. Moreover, the district court found as undisputed fact that a reasonable estimate in December 1984 of the number of units to be constructed on Shell Island was 500; at $1500 per unit, Wrightsville Beach could expect to raise approximately $750,000 in impact fees from Shell Island development and an additional $240,000 from the approximately 160 tracts of undeveloped land in Wrightsville Beach for a total of $990,000. A comparison of the $990,000 figure with the $1.5-2 million estimated costs for anticipated development demonstrates that the selection of a $1500 impact fee was not arbitrary or unreasonable.
 
 
 20
 We therefore conclude that Shell Island did not carry its burden of showing that Wrightsville Beach abused its sound discretion by classifying Shell Island Developers as one of the entities who should bear "capital costs associated with ... anticipated growth." Bissette, 287 S.E.2d at 853 (quoting Town of Spring Hope v. Bissette, 280 S.E.2d at 492-93.
 
 IV
 
 21
 Shell Island also contended below and renews its contention here that funds collected as impact and tap fees were in fact a tax and therefore violated N.C. Const., Art. V, Sec. 2 limits on property taxation. To support this argument, Shell Island Developers argue that public enterprise funds raised through impact fees were spent on capital improvements that benefitted the general public rather than on capital improvements necessitated by Shell Island's development.
 
 
 22
 As discussed in the preceding section, the district court correctly held Wrightsville Beach's action constituted a proper exercise of its state-law authority to impose utility system impact fees for the purpose challenged. Moreover, even if funds collected as impact fees were in fact improperly expended, this would not change the character of the impact fees into a tax. As the district court correctly noted, whatever infirmity existed in the impact fees' expenditure in no way affected the legality of their imposition. Moreover, the Shell Island Developers do not on this appeal challenge their expenditure under the relevant Wrightsville Beach Ordinance.
 
 
 23
 Moreover, even if we were being asked to review the propriety of the expenditures under the water and sewer ordinance, which we are not, Shell Island Developers, who have the burden of proof, have come forward with no cost analysis or other evidence which would indicate that the impact fees were put to anything other than their purported use.
 
 V
 
 24
 We next turn to consideration of Shell Island's federal claims of violation of their rights under the equal protection clause of the fourteenth amendment.
 
 
 25
 In the area of economics and social welfare, a State does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect. If the classification has some "reasonable basis," it does not offend the Constitution simply becuase the classification "is not made with mathematical nicety or because in practice it results in some inequality" .... It is enough that the State's action be rationally based and free from invidious discrimination.
 
 
 26
 Dandridge v. Williams, 397 U.S. 471, 485, 487 (1970) (citations omitted). A state's economic legislation is entitled to a "strong presumption of constitutionality" when it is attacked on equal protection grounds. Dieffenbach v. Attorney Gen. of Vermont, 604 F.2d 187, 195 (2d Cir.1979). If any state of facts can be reasonably conceived that would sustain the classification created by the regulation, the existence of that set of facts must be assumed. Morey v. Doud, 354 U.S. 457, 464 (1957).
 
 
 27
 Shell Island Developers do not dispute that the impact and tap fees were made pursuant to a legitimate governmental objective. Rather, Shell Island disputes that there was any rational relation between the admittedly legitimate municipal objective of improving the sewer and water infrastructure and the means of accomplishing that objective: imposing the fee on Shell Island's developers. This argument, as we understand it, has two prongs. First, that the decision to increase the impact fee by a factor of three was arbitrarily reached and therefore bore no rational relationship to the actual amount of needed improvement to the infrastructure. This, argues the Shell Island Developers, supports the contention that the impact fee increase was a mere pretext for building a general fund for capital improvements to generally benefit Wrightsville Beach in a manner unrelated to Shell Island's actual development. Second, Shell Island argues that, even if a rational relationship existed between the funds collected as impact fees and their purported use--sewer and water infrastructure development--Shell Island's development had no effect upon the infrastructure and therefore forcing Shell Island Developers to bear those costs was an impermissible classification of those who should bear those costs.
 
 
 28
 * To support its argument that the decision to increase the impact fee by a factor of three was arbitrarily reached and therefore reflected no nexus to the actual amount of needed improvement to the infrastructure, Shell Island points to a memorandum from the Town's director of public works to the effect that "it is time to adjust [the] fee" and that such increase should be an "arbitrary" threefold increase. See J.A. at 96, 299, 390, 501. This argument, focussing on the perhaps improvident choice of language, seeks to make more of it than logic will support. Their burden, a heavy one, is to show no conceivable basis for the threefold increase. See Lehnhausen v. Lake Shore Auto Parts Co., 410 U.S. 356, 364 (1973). Except for the cited memorandum, the Shell Island Developers have come forth with absolutely no cost analyses or other evidence showing why the amount of the fees was inappropriate. As noted by the district court, it is clear that the impact fee bore a rational relationship between the burden and its bearer. The impact fees collected from Shell Island Developers accounted for $750,000 of $1.5 to 2 million dollars in anticipated costs necessitated in large part by Shell Island's development, which accounted for 75% of new growth. These findings are undisputed. Shell Island Developers point to no evidence suggesting that requiring Shell Island to bear somewhere between 37.5 and 50% of the cost of infrastructure improvement is in any way disproportionate. The Town Council of Wrightsville Beach might well have determined that it was fiscally sound to impose the costs of accelerated expansion, renewal, and improvement of the sewer and water system upon those creating the need. Such a determination is clearly enough to uphold the ordinance against an equal protection challenge. See Ivy Steel & Wire Co. v. City of Jacksonville, 401 F.Supp. 701, 705 (M.D.Fla.1975). In any event, mathematical precision is not required. See Sproles v. Binford, 286 U.S. 374, 388 (1932) ("[t]o make scientific precision a criterion of constitutional power would be to subject the state to an intolerable supervision"). We think it obvious that the memorandum's use of the word "arbitrary" in the context used was simply a concession that the threefold increase figure was not a mathematically precise one, rather than that it bore no rational relationship to the relevant factors.
 
 
 29
 Shell Island Developers' pretext argument also fails. They offer nothing more than conclusory statements to the effect that the impact fees were collected as a mere pretext for building a general fund for capital improvements to generally benefit Wrightsville Beach in a manner unrelated to Shell Island's actual development. This contention fails for utter lack of any proof on the part of the Shell Island Developers.
 
 B
 
 30
 Shell Island Developers, relying upon the fact that much of the improved and enlarged infrastructure was already in place when Shell Island sought annexation, argue finally that, even if a rational relationship existed between the funds collected as impact fees and their purported use--sewer and water infrastructure development--Shell Island's development had no effect upon the infrastructure. Therefore, imposing the burden of such improvement upon the Shell Island Developers constituted an arbitrary and impermissible classification of who should bear those costs.
 
 
 31
 Contrary to Shell Island's contentions, the district court's undisputed findings of fact show that the improved infrastructure did not eliminate the need for acquiring additional capacity beyond that already present in 1984, created by Shell Island's anticipated growth. See J.A. at 260-61. Imposing the burden of this increased capacity upon those who caused the increased need is manifestly rational. Indeed, it would be perverse to impose the costs of infrastructure improvement upon the earlier residents of Wrightsville Beach who had presumably borne the costs of the pre-development infrastructure to the extent that such extant infrastructure had the capacity to meet their demands.
 
 
 32
 In short, we find that Shell Island Developers have failed to carry their burden of showing that there was no "conceivable basis which may support" Wrightsville Beach's actions. Lehnhausen, 410 U.S. 356.
 
 AFFIRMED
 
 
 [1]
 Judge Haynsworth participated in the hearing of this case by listening to the recorded oral arguments but died prior to the time the decision was filed. The decision is filed by a quorum of the panel. 28 U.S.C. Sec. 46(d)
 
 
 [2]
 Shell Island also may invoke Burford v. Sun Oil Co., 319 U.S. 315 (1943), to justify abstention. There is no evidence that North Carolina courts "stand in any special relationship of technical oversight or concentrated review" over municipal fee imposition such as to justify Burford abstention. Educational Serv., Inc. v. Maryland State Bd. for Higher Educ., 710 F.2d 170, 173 (4th Cir.1983)