125 P.3d 396

STOP EXPLOITING TAXPAYERS, a Mesa Political Committee; Janeva A. Hibbard, its Chairman; Jose David Molina, a Mesa resident, Plaintiffs–Appellants,

v.

Barbara JONES, in her official capacity as the Mesa City Clerk; City Of Mesa, a political subdivision of the State of Arizona, Defendants–Appellees.

No. 1 CA–CV 04–0819.

Court of Appeals of Arizona, Division 1, Department E.

Dec. 22, 2005.

Irvine Law Firm, PA By Thomas K. Irvine, Ellen M. Van Riper, Phoenix, Attorneys for Plaintiffs–Appellants.

Deborah J. Spinner, Mesa City Attorney By James N. Smith, Jr., Assistant City Attorney, Charles L. Cahoy, Assistant City Attorney, Mesa, Attorneys for Defendants–Appellees.·

## OPINION

OROZCO, Judge.

¶ 1 In this appeal from summary judgment to the Mesa City Clerk and the City of Mesa (the City defendants), we conclude that municipal ordinances setting rates charged for city-owned utility services are administrative acts and therefore are not subject to referendum.

### FACTUAL AND PROCEDURAL BACKGROUND

¶ 2 On June 21, 2004, the Mesa City Council adopted four ordinances that adjusted the City's water, wastewater, gas, and solid waste utility rates. Stop Exploiting Taxpayers (SET) registered with the Arizona Secretary of State as a political committee and filed an application for a referendum petition number with the Mesa City Clerk to begin collecting Mesa voter signatures to refer the four utility ordinances in a single referendum for voter approval at the next city election.[1]

---

1. Qualified electors of municipal corporations may circulate petitions and refer legislation, which their elected representatives have enacted, to a popular vote. Ariz. Const. art. 4, pt. 1, § 1(8). A person or organization intending to refer city legislation is required to submit to the city clerk an application, which includes the person's or the organization's intent to circulate or file a petition and a description of no more than one hundred words of the main provisions of the measure to be referred. Ariz.Rev.Stat. (A.R.S.) §§ 19–141, –111 (2002). The person or organization must also apply for an official petition number. A.R.S. § 19–111.A.

Generally, a person or organization is required to file the signed petitions, containing the requisite number of signatures, with the city clerk

578

When SET filed the application, a deputy city clerk advised SET that it should file four separate applications for each ordinance. SET rejected the suggestion, and at SET's request, the clerk issued only one petition for SET's proposed referendum.

¶ 3 After SET returned the petition bearing the collected signatures to the clerk, the Mesa City Clerk and Mesa City Attorney notified SET that it would not transmit the referendum petition to the Maricopa County Recorder for certification because utility rate making was an administrative act that was not subject to referendum and it was unlawful to refer four separate ordinances in one petition.

¶ 4 SET filed a Special Action asking the trial court to order the City defendants to transmit the petition for certification. The trial court considered cross-motions for summary judgment and granted judgment to the City defendants. SET filed a timely appeal. We have jurisdiction pursuant to Arizona Revised Statutes (A.R.S.) section 12–120.21 (2003).

## MOOTNESS

¶ 5 The City defendants request that the appeal be dismissed as moot because the City of Mesa has adopted ordinances and resolutions readjusting the utility rates that are the subject of this appeal. They argue that because the utility rates at issue are no longer in effect, a referendum election on whether to approve or disapprove those rates is no longer required.

¶ 6 Generally, a court will not consider moot questions. *Lana v. Woodburn,* 211 Ariz. 62, 65, ¶ 9, 116 P.3d 1222, 1225 (App. 2005) (citing *Fraternal Order of Police Lodge*

within thirty days after the city council passed the measure to be referred. A.R.S. §§ 19–141, –142.A (2002). Within fifteen days of the referendum being filed, the city clerk must count the signatures to be verified to determine if they exceed the minimum number of required signatures and to select at random, five per cent of the total signatures eligible for verification by the county recorder. A.R.S. § 19–121.01 (2002) Within ten days of receiving the signatures sheets from the city clerk, the county recorder is required to verify and certify the signatures. A.R.S. § 19–121.02 (Supp.2005).

*2 v. Phoenix Employee Relations Bd.,* 133 Ariz. 126, 127, 650 P.2d 428, 429 (1982)). A court, however, will address moot questions if the issues are of great public importance or are capable of repetition yet evading review. *Id.* This issue on appeal satisfies either criterio. We therefore deny the City defendants' motion to dismiss the appeal as moot.

## STANDARD OF REVIEW

¶ 7 In reviewing an appeal from summary judgment in which the material facts are undisputed, we consider whether the trial court correctly applied substantive law to the facts. *Faz v. Ford Motor Credit Co.,* 191 Ariz. 191, 193, 953 P.2d 935, 937 (App.1997). For reasons set forth below, we affirm the judgment.

## DISCUSSION

¶ 8 Determining whether the ordinance is subject to referendum depends on whether a municipal ordinance setting utility rates is an administrative or legislative act to determine.

¶ 9 Although the constitutional right to referendum is broadly construed, *Lawrence v. Jones,* 199 Ariz. 446, 449, ¶ 7, 18 P.3d 1245, 1248 (App.2001), only legislative acts are subject to referendum. *Redelsperger v. City of Avondale,* 207 Ariz. 430, 432, ¶ 9, 87 P.3d 843, 845 (App.2004); *Wennerstrom v. City of Mesa,* 169 Ariz. 485, 488, 821 P.2d 146, 149 (1991). Executive and administrative acts are not subject to referendum to avoid hampering the efficient administration of local governments. *Id.*

¶ 10 In *Wennerstrom,* the Arizona Supreme Court set forth the pertinent factors to distinguish between legislative and administrative acts. 169 Ariz. at 489, 821

If the city clerk refuses to accept and file a timely presented petition for referendum or if the clerk refuses to transmit the signature sheets to the county recorder for certification, the clerk must provide the person submitting the petition with a written statement of the reason for the refusal. A.R.S. § 19–122.A (2002). Within ten calendar days after the refusal, any citizen may apply to the superior court for a writ of mandamus to compel the city clerk to file the petition or proposal or transmit the signature sheets or file a complaint with the county attorney or the attorney general. A.R.S. § 19–121.A (2002).

P.2d at 150. Legislative acts generally relate to subjects of a permanent and general character which prescribe new policies or plans. *Id.; Redelsperger,* 207 Ariz. at 433, ¶ 15, 87 P.3d at 846. *See* 5 Eugene McQuillin, *The Law of Municipal Corporations* § 16.54 (3d rev. ed.1999); 6 Sandra M. Stevenson, *Antieau On Local Government Law* § 87.04 (2d ed.2005). Administrative acts are generally temporary, specific in subject matter, and intended to execute existing policies or plans. *Id.*

■ ¶ 11 The four challenged ordinances exhibit the characteristics of administrative acts. First, the ordinances list specific utility services that the City provides and contain schedules modifying the rates charged to users for those services. Second, the ordinances do not affect the underlying statutes and ordinances through which the City of Mesa owns and operates its utilities. Finally, utility rate changes are considered annually as part of the City's budget process and are subject to change in future budgets. Because the ordinances are administrative acts, they are not subject to referendum.

■ ¶ 12 Nevertheless, SET argues that even if rate increases are generally administrative, these ordinances are legislative acts that are referable because the City Council passed them to implement a general tax increase under the guise of a utility rate change. To support its claim, SET cites the City Council meeting minutes which contain comments that the proposed increases were driven by the need to generate revenues for the general fund far more than the need to cover increased utility operating costs. It also references statements that the city staff and council members made acknowledging that utility revenue increases were necessary to balance the city budget. The City defendants have also acknowledged that Mesa's utility operations have historically provided excess revenue which has been used to support other services, including police and fire protection.

¶ 13 Although Arizona appellate courts have not previously addressed the issue, other jurisdictions have held that utility rates are not taxes even if some of the proceeds transferred to the general fund are used for

other governmental programs. *See United States v. City of Columbia, Mo.,* 914 F.2d 151, 155 (8th Cir.1990) (holding utility rate that included profit component is not a tax); *Gen. Textile Printing & Processing Corp. v. City of Rocky Mount,* 908 F.Supp. 1295, 1304 (E.D.N.C.1995) ("The profits from the utilities help finance the City's costs of governing. This fact alone does not convert the charge into a tax...."); *Apodaca v. Wilson,* 86 N.M. 516, 525 P.2d 876, 885–86 (1974) (determining utility fees transferred to general fund not a tax); *Walker v. Brigham City,* 856 P.2d 347, 351 (Utah 1993) (concluding city utility rates yielding excess revenue does not constitute a tax or unconstitutional taking). *See generally* 12 McQuillin, *supra* at § 35.38 (discussing general rule that rates charged for city-owned utilities ordinarily are not taxes). We find these authorities persuasive.

¶ 14 The significant differences between a utility rate and a tax may be summarized as follows:

> While the payment of a tax does not transfer ownership, the payment of a ... utility rate ... transfers ownership of water and electricity. And, while failure to pay a tax results in civil, sometimes criminal penalties, the failure to pay a portion of a utility rate results in termination of services. [A consumer's] obligation to pay the [rate] arises only from [the consumer's] consensual purchase of the City's property; it does not arise automatically, as does tax liability....

*United States v. City of Columbia, Mo.,* 914 F.2d at 155. Additionally, a customer is charged a utility rate as part of the of price of consuming the City's utilities and related services. *Id.*

¶ 15 The City's use of revenues from its utility services to offset other costs of governing does not automatically convert utility rates into a tax. The utility rate increases do not share the characteristics of a tax increase, primarily because the City's residents are charged the utility rates for the services they receive. Additionally, the City's budget director avowed that while the utility rate changes will increase the City's

revenues by a projected $ 8 million, the preliminary budget that was presented to the City Council shows that the operating costs will increase to approximately $8.85 million. The meeting minutes also include substantial debate directly related to the expense of providing utility services. Discussions involved the need to address escalating maintenance and operational costs to the utilities, aging infrastructure, and understaffing. For these reasons, we are not persuaded by SET's argument that the City passed a tax disguised as a utility rate increase.[2]

¶ 16 SET next argues that the Mesa City Charter makes the referendum applicable to increases in utility rates. It relies on the following charter provision:

> Ordinances levying taxes or granting, renewing, or extending a franchise or regulating the rate charged by any *public utility* for its services, except as otherwise provided in this Charter, shall not be classified as emergency measures. (Emphasis added).

Mesa City Charter, art. 2, § 212.

¶ 17 SET begins with the legal proposition that legislative acts that do not contain emergency clauses are subject to a thirty-day delay in becoming effective to allow citizens to exercise their right of referendum. *See* A.R.S. § 19–142.B (2002); *Israel v. Town of Cave Creek*, 196 Ariz. 150, 154, ¶ 22, 993 P.2d 1114, 1118 (App.1999). SET reasons that because the city charter declares that ordinances regulating *public utility* rates cannot be classified as emergency measures, the rates charged for *City-owned utility* services also cannot be deemed emergencies. SET asserts that a rate increase for *City-owned* utility services therefore must be legislative acts that are subject to referendum. Though this argument was not raised in the trial court and was therefore waived, *Maricopa County v. State*, 187 Ariz.

275, 281, 928 P.2d 699, 705 (App.1996), we exercise our discretion and address the merits.[3]

¶ 18 SET's argument fails because § 212, which they contend prohibits City-owned utility rates from being classified as emergency measures, does not apply to City-owned utility services. Another charter provision, § 210, differentiates between "public utilities" and "City-owned utilities." Section 210(C) empowers the Council to enact ordinances to "[r]egulate rates and fees charged by *public utilities* and fix rates and fees for *City-owned utilities.*" (Emphasis added). Within the Mesa City Charter, a public utility and a City-owned utility are two different types of entities that are not interchangeable in meaning. Section 212 therefore is inapplicable, and we reject SET's argument that the Mesa City Charter makes utility rate increases subject to referendum.

¶ 19 SET next contends that Arizona case law has already determined that utility rate setting is a legislative function. SET cites cases involving the Arizona Corporation Commission, including *Simms v. Round Valley Light & Power Co.*, 80 Ariz. 145, 294 P.2d 378 (1956). *Simms* states that in exercising its rate-making power, the Commission has "a range of legislative discretion." *Id.* at 154, 294 P.2d at 384.

¶ 20 SET's argument overlooks the status of the Arizona Corporation Commission as a fourth branch of government, wholly separate from the legislative, executive, and judicial branches. In areas in which the Corporation Commission is given exclusive power, it is supreme subject to judicial review. *State v. Tucson Gas, Elec. Light & Power Co.*, 15 Ariz. 294, 306, 138 P. 781, 786 (1914). The Commission neither owns, operates, nor manages utility companies but is constitutionally empowered to prescribe reasonable rates and charges for public service

---

2. Because the record does not show that the City Council passed the rate increases as a disguised tax increase, we need not decide whether a disguised tax would be referable.

3. SET asserts that this issue was raised in its response to the City defendants' motion for summary judgment. However, while a footnote in the response refers to the charter generally, it

does not refer to the section upon which SET now relies nor does it contain the substance of the argument on appeal. Although appellate courts generally do not consider issues not raised in the trial court, that rule is procedural rather than jurisdictional, and we may consider the merits. *Larsen v. Nissan Motor Corp. in U.S.A.*, 194 Ariz. 142, 147, ¶ 12, 978 P.2d 119, 124 (App.1998).

corporations. Ariz. Const. art. 15, § 3. In setting rates, the Commission is not pursuing a plan already adopted by a legislative body and is not engaged in setting rates within an annual budgeting process. Cases such as *Simms* address the proper standard by which courts review Commission orders. *Simms* does not analyze whether Commission actions are administrative or legislative. The Commission's unique constitutional authority makes the referendum power inapplicable to Commission actions. Therefore, cases involving the Commission's authority are not persuasive in deciding whether a municipality fixing rates for City-owned utilities is also engaged in legislative action.

¶ 21 Finally, SET urges this court to follow those states which have found that setting utility rates is a legislative action subject to the referendum power.

¶ 22 In *Wennerstrom*, the Arizona Supreme Court acknowledged the difficulty in applying the standards it adopted with respect to distinguishing administrative from legislative acts, noting that other jurisdictions have found cases addressing this issue to be irreconcilable. 169 Ariz. at 489, 821 P.2d at 150. *See generally* 5 McQuillin, *supra* at §§ 16.55–16.58, § 35.37 (comparing cases addressing whether setting utility rates is legislative or administrative).

¶ 23 Cases finding rate setting for municipally-owned utilities to be an administrative act include: *In re Mitchell*, 44 Ill.App.2d 361, 194 N.E.2d 560 (1963); *Johnson v. City of Alamogordo*, 121 N.M. 232, 910 P.2d 308, 313 (1996); *In re Sup.Ct. Adjudication of Initiative Petitions in Norman, Okla. No. 74–1 and 74–2*, 534 P.2d 3, 7 (Okla.1975). *Contra McKinley v. City of Fraser*, 366 Mich. 104, 114 N.W.2d 341 (1962) (holding initiative power may be used to set city sewage disposal system charges); *Walker*, 856 P.2d at 349 (stating that fixing electric rates for municipally owned utility is legislative act).

¶ 24 Differences among jurisdictions with respect to deeming an action legislative or administrative often result from that state's unique constitutional and statutory provisions creating the referendum power and the need to reconcile related statutory provisions. *E.g., McKinley*, 114 N.W.2d at 343

(reasoning that using initiative power to set rates for city sewer permitted because home rule act authorized initiative and referendum powers "on all matters within the scope of its [the city's] powers"); *Hoover v. Carpenter*, 188 Neb. 405, 197 N.W.2d 11, 13 (1972) (adopting rule that the language of the governing legislative provision and the facts of each case determines whether municipal ordinance is subject to the right of referendum). There are no Arizona statutory or constitutional provisions which conflict with deciding that municipal rate increases are administrative acts that are not subject to referendum.

¶ 25 Instead, determining that utility rate increases are subject to referendum would be inconsistent with other statutory provisions. In evaluating the relationship between setting rates for municipal utilities and Arizona statutes governing municipal utilities, we consider A.R.S. §§ 9–521 to –540 (1996), the comprehensive regulatory scheme that permits municipalities to issue bonds to finance its utility services. The purpose of these statutes is to insure the marketability of the bonds. 1970 Ariz. Sess. Laws, ch. 89, § 1. To give effect to this intent, the revenue pledged to bond repayment must be secure.

¶ 26 Mesa voters approved the issuance of the revenue bonds which support the utilities involved in this appeal. The bonds are to be repaid solely out of utility revenues. A.R.S. § 9–524.A.4 (1996). Mesa's governing body is required to establish charges sufficient to repay those bonds at a rate not less than one hundred twenty-five percent of the rate in effect on the date of determination. A.R.S. § 9–530.C (Supp.2004).

¶ 27 The Arizona League of Cities of Towns and several municipalities jointly filed an amicus brief with this court emphasizing potential problems if utility rate setting is subject to referendum. They assert that freezing rates at a current level would directly violate the provisions of A.R.S. § 9–531.B (1996), which states that bond resolutions are deemed to be contracts with the bond holders that may be enforced by court action. One of the many provisions in a bond resolution, as well as the statutory scheme itself, is

a mandate that the governing body adjust rates from time to time to keep the utility on a self-sufficient basis. *See* A.R.S. § 9–530.C. This statute would be ineffective if it could be circumvented by referendum. In setting utility rates the City of Mesa must act in accordance with A.R.S §§ 9–521 to –540. This is further indicia that it is engaged in an administrative function under the tests set forth in *Wennerstrom.*

## CONCLUSION

¶ 28 We conclude that the City of Mesa ordinances challenged by SET are not subject to referendum. We therefore affirm the judgment of the trial court. Because we find these ordinances result from administrative action when analyzed under the test set forth in *Wennerstrom,* we do not consider whether separate referendum petitions were required for each ordinance.

CONCURRING: ANN A. SCOTT TIMMER and JOHN C. GEMMILL, JJ.